J. E. Casner and Una J. Casner, et al. [1] v. Commissioner. Casner v. Commissioner
Docket Nos. 117-67, 140-67, 141-67, 6522-67.
United States Tax Court
T.C. Memo 1969-98; 1969 Tax Ct. Memo LEXIS 196; 28 T.C.M. (CCH) 535; T.C.M. (RIA) 69098; May 15, 1969 Filed *196 Towner Leeper, 7th Floor, S.W. Nat'l Bank Bldg., El Paso, Tex., for the petitioners. Ralph V. Bradbury, Jr., for the respondent. 536 FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the calendar year 1964 in the following amounts: Docket No.
Petitioners
Defi- ciency
117-67
J.E. and Una J. Casner
$4,700.47
140-67
B.R. and Winifred Slight
1,275.53
141-67
Forrest and Geraldine Walker
5,328.91
6522-67
J.D. and Una Holman
7,972.49 In amended answers filed with this Court on January 8, 1968, respondent asked for increased deficiencies in Docket No. 117-67 and Docket No. 141-67 for the year 1964 in the respective amounts of $5,509.05 and $3,837.74. The only issue remaining for decision is whether or not certain corporate distributions to petitioners in 1964 are taxable to them as dividends. Findings of Fact Some of the facts have been stipulated and are found accordingly. J. E. Casner and Una J. Casner are husband and wife. They resided in Alpine, Texas, at the time their petition in this case was filed. They filed a joint Federal income tax *197 return for the calendar year 1964 with the district director of internal revenue, Austin, Texas. B. R. Slight and Winifred Slight are husband and wife. They resided in Alpine, Texas, at the time their petition in this case was filed. They filed a joint Federal income tax return for the calendar year 1964 with the district director of internal revenue, Austin, Texas. Forrest Walker and Geraldine Walker are husband and wife. They resided in Alpine, Texas, at the time their petition in this case was filed. They filed a joint Federal income tax return for the calendar year 1964 with the district director of internal revenue, Austin, Texas. J.D. and Una Holman are husband and wife. They resided in Alpine, Texas, at the time their petition in this case was filed, They filed a joint Federal income tax return for the calendar year 1964 with the district director of internal revenue, Austin, Texas. Casner Motor Company of Alpine, Texas, Inc., is a Texas corporation with its principal place of business in Alpine, Texas. The corporation will hereinafter be referred to only as Alpine. Casner Motor Company of Marfa, Texas, Inc., is a Texas corporation with its principal place of business *198 in Marfa, Texas. The corporation will hereinafter be referred to only as Marfa. In January 1957, J. E. Casner (hereinafter referred to only as Casner), Forrest Walker (hereinafter referred to only as Walker), J. D. Holman (hereinafter referred to only as Holman), and B. R. Slight (hereinafter referred to only as Slight) formed Alpine. They transferred to Alpine assets from their partnership. The assets had a book value of $168,580.99 and liabilities of $11,910.57. Alpine issued $100,000 of $10 par value common stock and credited paid-in surplus $56,670.42. The stock was issued as follows: Stockholder
No. of Shares
Casner
4,177
Holman
2,500
Slight
823
Walker 2,500
Total
10,000
In January 1957, Casner and three other individuals formed Marfa. They transferred to Marfa assets having a book value of $139,516.20, and liabilities of $36,082.73. The corporation issued $100,000 of $10 par value common stock and credited paid-in surplus $3,433.47. The stock was issued as follows: Stockholder
No. of Shares
J. E. Casner
6,750
Jack Edwards
2,500
H. F. Darr
750
L. E. Howard none
Total
10,000
The shareholders of Alpine and Marfa executed *199 mutual consent agreements in regard to their stock on February 6, 1960, and February 5, 1960, respectively. The agreements provided that on the death of a shareholder the issuing corporation shall be presented the decedent's stock. The corporation shall pay therefor the value of the stock in a sum not less than book value. It was further provided that no living shareholder shall sell or otherwise dispose of his stock to anyone other than another shareholder. If a living shareholder desires to sell or otherwise dispose of his stock, the corporation shall have the right to purchase such stock at not less than its corporate book value. Also on February 5, 1960, Casner transferred to Walker 833 shares of Alpine common stock. 537 On April 1, 1961, Casner, Holman, Walker, and Slight transferred additional assets having a book value of $15,032.81 to Alpine. The corporation issued $9,680 of $10 par value common stock and credited paid-in surplus $5,352.81. The stock was issued as follows: Stockholder
No. of Shares
Casner
387
Holman
242
Walker
242
Slight 97
Total
968
Casner purchased 2,500 shares of Marfa common stock belonging to Jack Edwards (hereinafter *200 referred to only as Edwards) upon the death of Edwards on March 2, 1964. The cost was $32,586.28. Between 1957 and 1963 Casner gratuitously transferred to Holman two shares of Marfa common stock. During this same period Casner sold 600 shares of Marfa common stock to L. E. Howard. Alpine and Marfa have been operating as retail dealers of automobiles and trucks. They operate under "Dealer Selling Agreements" with the Chevrolet Division of General Motors. Their product lines include Pontiac, Buick, GMC Truck, Oldsmobile, Cadillac, and Chevrolet. In 1963 Casner was 75 years old. During that year R. P. Paulk, zone manager of Chevrolet, asked Casner whether he had any plans to retire. Casner was urged to do so. General Motors had instructed R. P. Paulk to contact all dealers in his zone 65 years and older. He was told to encourage such dealers to sell their stock interests and retire from management. By early 1964 Casner was becoming inactive in his automobile dealerships. Walker had assumed over-all responsibility for the operations of Alpine. Edwards had assumed the over-all responsibility for the operations of Marfa. Edwards died on March 2, 1964. Under the restrictive sales *201 agreement dated February 5, 1960, the estate of Edwards had to submit for redemption its shares of Marfa common stock. Casner notified Chevrolet of the death of Edwards by letter dated March 23, 1964. Casner requested an extension of time to arrange for the disposition of Edwards' ownership in Marfa. By letter dated March 31, 1964, zone manager O. E. Alexander, Jr. (hereinafter referred to only as Alexander) granted the requested extension of time for disposition of the stock. Alexander acted pursuant to the Chevrolet Dealer Selling Agreement. Casner purchased the 2,500 shares of stock owned by Edwards with a check dated April 7, 1964. The death of Edwards gave Chevrolet, acting through the zone manager Alexander, another opportunity to encourage Casner to dispose of his stock interest in Alpine and Marfa. During March 1964, Walker and Casner twice met with Alexander in El Paso, Texas. Alexander strongly recommended that Casner sell his stock in Alpine and Marfa. No decision was reached at the first meeting. At the second meeting Casner agreed to dispose of his stock. The parties were aware that General Motors requires all stock in a dealership to be purchased and sold at book *202 value. At the second meeting Casner asked Chevrolet to designate his son-in-law Holman, as its dealer at Marfa. Chevrolet refused to appoint anybody other than Herb Harlow, who had been sales manager of Alpine. Chevrolet did approve Walker's request to bring Kenneth Stucke into the Alpine dealership. Kenneth Stucke had been an experienced sales manager of the Ford Motor Company dealership in Alpine, Texas. The dealership agreements of General Motors require individuals in whose name dealership agreements are executed to own a substantial percentage of the corporate stock. For that reason Chevrolet was agreeable to Walker's acquiring a greater percentage of the stock in Alpine and Marfa. Since Slight had become inactive in the management of Alpine, he agreed to dispose of his stock interest in that corporation. When Casner agreed to sell his stock, he insisted upon receiving as much cash as possible from the sale. It was anticipated, however, that the purchasers would not have sufficient cash to purchase Casner's shares of Marfa and Alpine stock at their current book values. Alexander recommended to Casner that Marfa and Alpine distribute some of their cash. The distributions *203 would reduce the book values of the shares which Casner and Slight were perparing to sell. Following the two meetings between Alexander, Walker, and Casner, it was decided that a certified public accountant (hereinafter referred to only as the CPA) should compute the book values of Alpine and Marfa stock as of March 31, 1964. The CPA was notified that Casner and Slight would sell some of their shares to new shareholders, Herb Harlow and Kenneth Stucke. Casner would sell his remaining shares to present shareholders Holman and Walker. 538 The shareholders of Marfa held a special meeting on March 26, 1964. The minutes of the meeting state in part: Mr. J. E. Casner, President and acting chairman of the meeting, stated that he was desirous of retiring from active management in the corporation and that in order to do so, he wanted to sell his stock and that in the name of Mrs. Casner to the other stockholders in accordance with the Mutual Consent Agreement dated February 5, 1960, and in order to reduce the value of the stock he suggested that the paid-in capital surplus of the corporation, in the amount of $3,433.47 be distributed to the present stockholders. The shareholders *204 of Alpine held a special meeting on March 27, 1964. The minutes of that meeting state in part: Mr. J. E. Casner, President and acting Chairman of the meeting, stated that he was desirous of retiring from active management in the corporation and that in order to do so, he wanted to sell his stock and that in the name of Mrs. Casner to the other stockholders in accordance with the Mutual Consent Agreement dated February 6, 1960, and in order to reduce the value of the stock he suggested that the Paid-in Capital Surplus of the corporation, in the amount of $62,023.23 be distributed to the present stockholders. In order to keep the reduction of cash to a minimum, he stated that he would be willing to purchase the mortgage note of Alpine Butane Company, Inc. for the balance owing at March 31, 1964 and the 1964 Cadillac car that he is using. B. R. Slight stated that he would purchase the 1964 Chevrolet car that he is using to further reduce the amount of cash required to pay out the capital surplus, as he would be selling his stock at the same time. The CPA operated a one-man office. He decided to set aside consummation of Casner's stock transactions until he had completed all pending *205 tax preparation work. He was not able to complete his working papers until May 25, 1964. The working papers contained the note: "Sales of Stock are after the distribution in cash by both corporations of the Paid-in Capital Surplus, and at book values of the stock as at March 31, 1964." On May 26, 1964, the CPA wrote the following letter to Bedford Walters, the chief accountant of Alpine: In accordance with the review and agreement of the officers of the company, it is suggested that you make distribution of the paid-in capital surplus in the amount of $62,023.23 to the shareholders of record as of March 27, 1964, as follows: Sharerolder's
No. of
Paid-in-Capi-
Name
Shares
tal Surplus
J. E. Casner
2,476
$14,001.62
Una JacksonCasner
1,255
7,096.93
J. D. & Una Joy Hol- man
2,742
15,505.80
Forrest C. Walker
3,575
20,216.35
B. R. Slight 920
5,202.53
Totals 10,968
$62,023.23 It is understood that Mr. Casner will purchase from the company the Mortgage note from Alpine Butane Company at the book value at March 31, 1964 of $20,100.00, after adjustment for reduction due to payments in April and May of $200. Each on the principal and interest *206 received of $200.00. The present note blance is $19,700.00 and the interest earned should apply to him and reduce the settlement to $19,500.00, as the transaction was to take place on March 31, 1964. In addition, it is understood that he will purchase the 1964 Cadillac car that he is using for $4,900.00. In the settlement with B. R. Slight, it is understood that he will purchase the 1964 Chevrolet that he is using for $3,000.00. After the above transactions, the net reduction in cash funds of the company will be $62,023.23 for distribution of capital surplus, less purchases from the company of $27,400.00 or a net of $34,623.23. In accordance with meetings called on March 27, 1964 for the Stockholders and Board of Directors, certain sales and transfers of stock were authorized in addition to the above distributions of capital surplus. These sales and transfers will be effected as soon as the necessary legal documents are available and will be dated March 31, 1964, the effective date of the transfers. On May 26, 1964, the CPA also wrote to the chief accountant of Marfa instructing him to pay out pro rata all the paid-in surplus of the company. The distribution would be to the *207 shareholders of record as of March 27, 1964. The Board of Directors of Marfa held a special meeting on March 26, 1964, following the conclusion of the special stockholders meeting. The minutes state in part: On motion duly made and carried, the officers were authorized to make cash distribution of the Paid-in Capital Surplus of the corporation in the amount $3,433.47 to the shareholders of record on this date, with payment to be made at a future date when funds are available for distribution. 539 On motion duly made and carried, the value of capital stock outstanding for transfer purposes on March 31, 1964 is acknowledged to be the par value of $10.00 per share plus the value of the earned surplus of the corporation as reflected on the books of the corporation at March 31, 1964, in accordance with the Mutual Consent Agreement executed by all shareholders as of February 5, 1960. On motion duly made and carried, the Board of Directors accepted the resignation of J. E. Casner as President and Director, effective with his transfer of stock to others on March 31, 1964, and commended him for his services as a President and Director, and accepted resignation of Una J. Casner *208 as Director. The Board of Directors of Alpine held a meeting on March 27, 1964, after the conclusion of the special stockholders meeting. The minutes state in part: On motion duly made and carried, the officers were authorized to make cash distribution of the Paid-in Capital Surplus of the corporation in the amount of $62,023.23 to the shareholders of record on this date, with payment to be made at a future date when funds are available for distribution. On motion duly made and carried, the value of capital stock outstanding for transfer purposes on March 31, 1964 is acknowledged to be the par value of $10. per share plus the value of the earned surplus of the corporation as reflected on the books of the corporation at March 31, 1964, in accordance with the Mutual Consent Agreement executed by all shareholders as of February 6, 1960. On motion duly made and carried, the officers of the corporation were authorized, empowered and directed to sell the promissory Vendor's Lien and Deed of Trust Note of the Alpine Butane Company, Inc., Dexter D. Thomas, President, and Dexter D. Thomas and Katie B. Thomas, Individually, dated March 8, 1963, in the original principal sum of $22,500.00, *209 upon the condition that the same shall be sold for its book value on March 31, 1964 to J. E. Casner and they are also authorized to execute such necessary instrument of transfer and endorsement of transfer to J. E. Casner, with payment for the note to be made at time of distribution of Capital Surplus. On motion duly made and carried, the Board of Directors accepted the resignation of J. E. Casner as President and Director, effective with his transfer of stock to others on March 31, 1964 and commended him for his services as President and Director. On motion duly made and carried, the Board of Directors accepted the resignation of B. R. Slight as a Director, effective with his transfer of stock on March 31, 1964, and commended him for his services as a Director. On motion duly made and carried, the officers were directed to sell the company cars used in the business to J. E. Casner - 1964 Cadillac for $4,900.00 and to B. R. Slight - 1964 Chevrolet for $3,000.00 with payment to be made upon distribution of Capital Surplus. The CPA had prepared in the latter part of May 1964 the minutes for both corporations and stock certificates reflecting the changes in ownership. He backdated *210 the minutes to March 26 and 27, 1964. The paid-in surplus of Alpine and Marfa was distributed pro rata by the respective corporations to their stockholders by checks of the corporations dated May 27, 1964, and May 28, 1964, as follows: Stockholder
Alpine
Marfa
J. E. Casner
$21,098.55
$2,969.26
J. D. Holman
15,505.80
.69
Forrest Walker
20,216.35
B. R. Slight
5,202.53
L. E. Howard
206.01
H. F. Darr
257.51
Totals
$62,023.23
$3,433.47
On March 27, 1964, and immediately prior to the distribution of the paid-in surplus of Alpine and Marfa on May 27 and 28, 1964, respectively, the stock of Alpine and Marfa was owned as follows: Stockholder
No. of Shares ofAlpine
No. of Shares ofMarfa
J. E. Casner
3,731
8,648
J. D. Holman
2,742
2
Forrest Walker
3,575
B. R. Slight
920
H. F. Darr
750
L. E. Howard
600
Totals
10,968
10,000
On May 27, 1964, the CPA wrote Alfred E. Creigh, Jr., an attorney in Alpine. The CPA asked him to prepare the necessary promissory notes and agreements regarding Casner's and Slight's transfer of Alpine stock to Kenneth Stucke. His letter stated in part: The stock will be transferred *211 under date of March 31, 1964 and the notes to be prepared should be dated the same date. The stock certificates will be issued in the name of Kenneth Stucke but will be held with the notes as collateral. The two notes in the amounts shown above will be for a period of five years with interest at 5% per annum on the unpaid balances, with any payments made on 540 the notes to apply first to payment of interest and any balances as a reduction of principal. The notes and agreements were backdated to March 31, 1964. Contemporaneously with the pro rata distributions to the shareholders of Alpine and Marfa, the following transactions occurred: (1) Walker acquired from Casner 1,909 shares of Alpine and 2,500 shares of Marfa. The Alpine shares had a book value of $32,669.87 and the Marfa shares had a book value of $31,727.91. Walker issued a check on June 3, 1964, for $19,072.78 and transferred a secured note receivable for the balance. (2) Holman acquired 1,222 shares of Marfa from Casner at its book value of $15,505.80. Holman endorsed to Casner his check from Alpine. The check was for the amount of $15,505.80. Holman also received gratuitously from Casner 2,426 shares of Marfa. *212 The book value of the 2,426 shares was $30,788.77. (3) Herbert Harlow acquired from Casner 2,500 shares of Marfa stock with a book value of $31,727.91. He issued a promissory note to Casner for that same amount. (4) Kenneth Stucke acquired 1,822 shares of Alpine from Casner at their book value of $31,180.99. Stucke gave Casner his check on June 3, 1964, for $1,180.99 and executed a promissory note for the balance of $30,000. (5) Slight transferred to Stucke his 920 shares in Alpine at the book value of $15,744.51. Stucke paid $744.51 cash and issued a promissory note to Slight for the balance of $15,000. Casner purchased from Alpine a mortgage note of Alpine Butane Company for $19,500 and an automobile for $4,900. The CPA prepared the new stock certificates and cancelled the old certificates in connection with the various sales of stock. He backdated the new certificates to March 31, 1964. The stock ownership in Alpine and Marfa on December 31, 1964, was as follows: Stockholders
No. of Sharesof Alpine
No. of Sharesof Marfa
Kenneth Stucke
2,742
Forrest Walker
5,484
2,500
J. D. Holman
2,742
1,694
Una Holman
472
J. D. & Una J. Holman, Trustees
1,484
H. H. Harlow
2,500
L. E. Howard
600
H. F. Darr
750
Totals
10,968
10,000
*213 Although Holman, Walker, L. E. Howard and H. F. Darr received their pro ratashare share of the distributions from Marfa and Alpine, none of these individuals in 1964 sold or otherwise transferred any of their stock in Alpine and Marfa. In 1965 the number of new car sales of Alpine and Marfa was 315, an increase from 249 in 1964. The total amount "floor planned" [2] in 1965 was $1,993,381.10, as compared to $670,161.19 in 1964. On their Federal income tax returns Casner and Slight included the amounts received by them from Alpine and Marfa as part of the sales proceeds from the sale of their stock. Walker and Holman did not report on their Federal income tax returns the amounts distributed to them by Alpine and Marfa. In the statutory notices of deficiency issued to the petitioners, respondent stated that petitioners received unreported dividends in the taxable year 1964, as follows: Petitioners
Alpine
Marfa
CasnerIndus- tries,Inc.
J. E. & Una J. Casner
$21,098.55
$ 2,969.26
$12,538.17
Forrest & Geraldine Walker
20,216.35
11,145.05
J. D. & Una Holman
15,505.80
.69
B. R. & Winifred Slight
5,202.53
*214 Respondent and petitioners agree that Casner did not receive dividend income in the amount of $12,538.17 from Casner Industries, Inc. in 1964 and that Walker did not receive dividend income in the amount of $11,145.05 from Marfa in 1964. Opinion The sole issue remaining before the Court is whether or not distributions still in dispute from Alpine and Marfa on May 27 and 28, 1964, to the petitioners were dividends. If the distributions were dividends, 541 petitioners do not deny that there were sufficient current and accumulated earnings and profits in Alpine and Marfa to cover the amounts of the distributions. We conclude that the pro rata distributions to all the petitioners were dividends. Casner and Slight insisted on receiving as much cash as possible upon the sales of their shares. The purchasers of Casner's and Slight's shares did not have sufficient cash to purchase the shares at their book values immediately prior to March 31, 1964. The purpose of the pro rata distributions to shareholders of record as of March 27, 1964, was to reduce the book values. The distributions thereby enabled the purchasers to acquire their shares at a reduced cost. The distributions further *215 enabled Casner and Slight to maximize the amount of cash they would ultimately receive. See Merrill C. Gilmore, 25 T.C. 1321 (1956). We held therein that a corporate distribution received by the petitioner was a taxable dividend and could not be regarded, under the facts presented in the case, as a portion of the consideration received by the petitioner in the sale of his stock to a third party. Casner and Slight urge this Court to follow Steel Improvement and Forge Company v. Commissioner, 314 F. 2d 96 (C.A. 6, 1963), reversing 36 T.C. 265 (1961), and other cases cited therein. The petitioner therein, a domestic corporation, entered into a contract to sell its stock in a Canadian subsidiary to another Canadian corporation. Under the sales contract, petitioner could receive from its subsidiary a dividend of $180,000 (less Canadian withholding tax) prior to transfer of the stock. The sales contract further provided that if such dividend were less than that amount, the purchase price would be increased by the difference between the dividend and $180,000, but not to exceed $64,000. The petitioner in fact received from its subsidiary a dividend *216 of $116,000 less the 5 percent Canadian withholding tax in the amount of $5,800. The Court of Appeals for the Sixth Circuit viewed the question presented as whether that sum of $116,000 was a dividend taxable to petitioner as ordinary income or whether such sum was in fact a part of the purchase price on the sale of the subsidiary and therefore subject to tax as a capital gain. The petitioner contended that even though the payment was in the form of a dividend, the court must look behind the surface of the transaction to determine its true character. It was petitioner's position that such examination disclosed that in substance the payment that such examination disclosed that in substance the payment was actually a part of the purchase price. The Sixth Circuit concluded that the disputed dividend was properly taxable as ordinary income to the buyer rather than the petitioner since the buyer had beneficial ownership of the stock at the time when the dividend was established. The buyer and not the petitioner bore the operating risks of the business and stood to benefit from profits or suffer detriment from losses. Furthermore, the Sixth Circuit agreed with the petitioner that the amount *217 at issue constituted a portion of the purchase price arrived at by negotiation with the purchaser. The Sixth Circuit thus could not concur with the opinion of this Court that the amount of $116,000 was a dividend taxable to the petitioner. The holding of the Sixth Circuit in Steel Improvement is distinguishable from the immediate case in several respects. First, in our case the directors of Marfa and Alpine apparently did not intend to include the distributions as part of the purchase price. To the contrary, they appear to have intended expressly to exclude the amount of the distributions from the computation of the selling price of the shares, which was book value. Specifically, the directors of Marfa and Alpine declared the dividends on March 26 and 27, 1964. According to the minutes of the directors' meetings the date for determination of the book values of the shares of both corporations was not until March 31, 1964. A second distinction is that in our case four of the six recipients of the dividend distributions were not selling any shares. Consequently, it is totally inconsistent with the facts of this case to contend that the distributions represented portions of the purchase *218 price of Casner's and Slight's shares. As a third distinction, in the instant case beneficial ownership of the stock of Marfa and Alpine remained with the original owners at the time the dividends were declared on March 26 and 27, 1964, respectively, to shareholders of record on those dates. The minutes of the directors' meetings specifically stated the transfers of stock would not be effective until March 31, 1964. On this date Casner and Slight would resign as directors. 542 Walker and Holman contend on their own behalf that they were obligated to and did in fact turn their receipts over to Casner. It is their position that they acted simply as conduits for Casner and as such incurred no tax consequences. To support their position they cite: Fox v. Harrison, 145 F. 2d 521 (C.A. 7, 1944); and Commissioner v. Decker, 286 F. 2d 427 (C.A. 6, 1960), affirming 32 T.C. 326 (1959). In our case Walker received a dividend check dated May 27, 1964, from Alpine for $20,216.35. He issued to Casner a check on June 3, 1964, for $19,072.78 in part payment of 1,909 shares of Alpine stock and 2,500 shares of Marfa stock. Walker transferred to Casner *219 a secured note receivable for the balance of the purchase price of his shares. Holman received a dividend check dated May 27, 1964, from Alpine in the amount of $15,505.80 and a dividend check dated May 28, 1964, from Marfa in the amount of 69 cents. Holman endorsed the Alpine check over to Casner. We do not think either Walker or Holman served as mere conduits upon the receipt of their dividend checks. They fully utilized their dividends to purchase Alpine and Marfa stock. Certainly, they realized an economic benefit. Alternatively, petitioners contend that if the distributions are taxable, the distributions are taxable at capital gains rates under section 346(a) (2) of the Internal Revenue Code of 1954. Section 346(a) (2) provides that a distribution shall be treated as in partial liquidation of a corporation if the distribution: (1) is not essentially equivalent to a dividend; (2) is in redemption of a part of the stock of the corporation pursuant to a plan; and (3) occurs within the taxable year in which the plan is adopted or within the succeeding taxable year. McCarthy v. Conley, 341 F. 2d 948 (C.A. 2, 1965), certiorari denied 382 U.S. 838 (1965). *220 Petitioners do not dispute that the distributions were pro rata. Their position is that the distributions were not essentially equivalent to a dividend because the distributions caused a contraction of both Alpine and Marfa. As illustrated by the following table, they base their argument on the grounds that the distributions of the cash reduced working capital and thereby curtailed internal financing of new car acquisitions: Year
No. ofNew CarSales
InterestPaid
No. NotFloor Planned
No. New CarsFloorPlanned.
total AmountFloor Planned
1963
249
$1,603,87
143
185
$ 492,051.76
1964
249
2,284.71
113
237
670,161.19
1965
315
3,746.43
18
647
1,993,381.10
We cannot concur with petitioners that a contraction of the business of Alpine and Marfa resulted from the distributions. The transactions in question were clearly not a vertical liquidation which clipped off a part of the productive resources of the enterprises. The transactions were a horizontal slice off the top of a nest egg of cash accumulated from past earnings and profits. The distributions did not impair the business activities of the enterprises as they had been carried on before. *221 McCarthy v. Conley, supra. Since petitioners have not produced any other evidence to show that the pro rata distributions were not essentially equivalent to a dividend, we must conclude that the distributions are not taxable at capital gains rates under section 346(a) (2). Decisions will be entered under Rule 50. Footnotes
1. The proceedings of the following petitioners are consolidated herewith: B. R. Slight and Winifred Slight, Docket No. 140-67; Forrest Walker and Geraldine Walker, Docket No. 141-67; and J.D. and Una Holman, Docket No. 6522-67.↩
2. Floor planning appears to be assumed by the parties to describe the outside financing by dealers of their purchases of new cars and trucks.↩